UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VALERIY KALASHNIKOV and VICTORIA
LEDENEVA,
          *Plaintiffs*,

v.                                                              No. 3:20cv1018(MPS)

MYFIELD      LANE      HOMEOWNERS'
ASSOCIATION, INC., LOUIS LINDEMANN, in his
official capacity as Myfield Lane HOA Board
Member, President and individually, JEFFREY
KOZO, in his official capacity as Myfield Lane HOA
Board Member, Vice President and individually,
JOHN WINSTON FOWLKES III, in his former
official capacity as Myfield Lane HOA Board
Member, Treasurer and individually, KIMBERLY
LINDEMANN,          individually,        MAEGHAN
ROBIDOUX, individually and AMBER LEAHEY,
individually,
          *Defendants*

## RULING ON MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, Valeriy Kalashnikov and his wife, Victoria Ledeneva, own a home in a

planned community called "Myfield Lane" in Washington, Connecticut.  After the Myfield Lane

Homeowners' Association ("MLHOA") denied the Plaintiffs' request to make changes to their

property, the Plaintiffs, proceeding *pro se,*[1] filed suit against the MLHOA, its Executive Board

members Louis Lindemann, Jeffrey Kozo, Winston Fowlkes, and MLHOA members Kimberly

Lindemann, Maeghan Robidoux, and Amber Leahey, alleging (1) discrimination on the basis of

national origin (Russian), Ledeneva's gender, and their family status in violation of the Fair

Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") and its Connecticut analog, the Connecticut Fair

Housing Act, Conn. Gen. Stat. § 46a–64c *et seq.* ("CFHA") (counts 1, 8); (2) retaliation in

---

[1] Although she is self-represented, Ledeneva is a licensed attorney.  ECF No. 42 at 44 ¶ 9; ECF No. 49 at 69 ¶ 9.

violation of the FHA and CFHA (counts 2-5, 8); (3) quid pro quo and hostile environment harassment in violation of the FHA (count 6); (4) negligence (counts 7, 9); (5) negligent and intentional infliction of emotional distress (counts 10-11); defamation and defamation per se (counts 13-14); perjury (count 15); harassment (count 16); and extortion (count 17).[2] The Defendants move for summary judgment under Fed. R. Civ. P. 56.  ECF No. 42.  For the reasons set forth below, I grant the Defendants' motion as to all claims except for the retaliation claims in counts 2 – 5 and 8.

## I.    Factual Background

The following facts, which are taken from the verified complaint[3] and the parties' Local Rule 56(a) statements[4] and supporting exhibits, are undisputed unless otherwise indicated.

The Plaintiffs, who are Russian immigrants, have resided in Myfield Lane since 2015.  ECF No. 1 at ¶¶ 9-10.  Myfield Lane is a planned community in Washington, Connecticut.[5]  ECF No. 42 at 43 ¶ 1; ECF No. 49 at 65 ¶ 1.  It consists of thirteen single-family home lots.  ECF No. 42 at 43 ¶ 3; ECF No. 49 at 65 ¶ 3.  Five units have been built.[6]  *Id.* The Plaintiffs own Unit 1.  ECF No.

---

[2] The complaint does not include a count 12.

[3] The Plaintiffs' verified complaint "is treated as an affidavit for summary judgment purposes and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e). *See, e.g.*, Fed.R.Civ.P. 56(e) (requiring affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit)". *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

[4] Under Local Rule 56(a)2(ii), each statement by a nonmovant in the Statement of Additional Material Facts must be followed by a specific citation to record evidence.  Many of the Plaintiffs' Statements of Additional Material Facts fail to comply with this fact-by-fact citation rule because the Plaintiffs have lumped together multiple factual statements, which are not followed by individual citations for each statement. *See S.E.C. v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 108 (D. Conn. 2004) (Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.").

[5] As such, Myfield Lane is governed by the Common Interest Ownership Act, Conn. Gen. Stat. § 47-200 *et seq*. ECF No. 42 at 392, 449.  "In purchasing units in a common interest community, owners forfeit certain liberties with respect to the use of their property by voluntarily consenting to restrictions imposed thereon, as specified in the declaration of the community.. . . . Owners of units in a common interest community, in turn, secure the right to enforce those restrictions against others." *Grovenburg v. Rustle Meadow Assocs., LLC*, 174 Conn. App. 18, 43 (2017).

[6] In their Rule 56(a)2 Statement, the Plaintiffs denied the Defendants' statement that five units have been built, asserting that six units have been built but they did not cite any supporting evidence.  ECF No. 49 at 65 ¶ 3.  In any event, this fact is not material to the legal analysis of the Plaintiffs' claims.

42 at 43 ¶ 5; ECF No. 49 at 65 ¶ 5.  Except for Winston Fowlkes, the individual Defendants –

Louis and Kimberly Lindemann, Jeffrey Kozo, Maeghan Robidoux, and Amber Leahey – own

units in Myfield Lane and reside there.  *Id.*  Fowlkes is the Developer/Declarant of the community.

*Id*.  All of the units are occupied by families with minor children.  ECF No. 42 at 48 ¶ 24; ECF

No. 49 at 79 ¶ 24.

MLHOA

MLHOA is an association of unit owners that operates Myfield Lane.  ECF No 1 at ¶ 12;

ECF No. 15 at ¶ 12; ECF No. 42 at 392; ECF No. 49-26 at 78.  Under the MLHOA's bylaws, the

affairs of the community and association are governed by a three-person Executive Board.  ECF

No. 49-26 at 82.  Plaintiff Ledeneva was President of the MLHOA Executive Board from August

12, 2017 until October 21, 2018.  ECF No. 1 at ¶ 11; ECF No. 15 at ¶ 11; ECF No. 42 at 215-16.

Fowlkes and Louis Lindemann[7] also were Board members. ECF No. 1 at ¶¶ 17, 19.

Governing Documents

Myfield Lane is governed by various documents including its certificate of incorporation,

bylaws, public offering statement, and declaration.  ECF No. 42 at 43 ¶ 2; ECF No. 49 at 65 ¶ 2.

Myfield's "Public Offering Statement" contains the following provision regarding the

aesthetics of the community:

> Compatibility of Buildings and Improvements Erected under Development
> Rights to Existing Buildings and Improvements
>
> The general architectural style, structure type, and quality of construction
> of any buildings and improvements to be created on the property shall be consistent
> with the architectural style, structure type, and quality of those initially constructed.
> However, units may be laid out in different configurations or plans.  Similar, yet
> distinct, materials and construction techniques may be used to achieve this standard.
> No assurances are given that the currently approved site plan will not be amended

---

[7] Because both Louis and Kimberly Lindemann are named defendants, to avoid confusion, they are referred to using their full names.

so that new buildings might not be built in accordance with the currently approved site plan. However, if built, the buildings will conform to the foregoing standard. No other assurances as to architectural style, quality of construction, or size are made in these regards.

ECF No. 42 at 389.

Myfield Lane's "Declaration" contains a provision requiring that unit owners obtain permission before changing the exterior appearance of their unit. Specifically, Article XII, Section 12.1, entitled "Additions, Alterations and Improvements by Unit Owners," states as follows:

    (a)    A Unit Owner:

        (i) May make any improvements or alterations in the Dwelling on his or her Unit that do not impair the structural integrity or mechanical systems of the Dwelling or lessen the support of any portion of the Common Interest Community;

        (ii) May not change the appearance of the Common Elements, or the exterior appearance of a Dwelling on a Unit or any other portion of the Common Interest Community, without written permission of the Executive Board[.]

ECF No. 42 at 411-12.

MLHOA's bylaws provide that the Executive Board may assess fines for violations of the rules. Specifically, Section 5.2 of Article V states: "Fine for Violation. By resolution, following Notice and Hearing, the Executive Board may levy a fine of up to $50 per day for each day that a violation of the Instruments or Rules persists after such Notice and Hearing." ECF No. 42 at 462.

<u>2015</u>

Before the MLHOA Board was formed, the developers of Myfield Lane "allowed certain alterations." ECF No. 42 at 43 ¶ 4; ECF No. 49 at 65 ¶ 4. Ledeneva testified that in 2015, she and her husband asked the developers, Winston Fowlkes and Joseph Gitterman,[8] about making changes

---

[8] Gitterman is not a defendant.

to the Plaintiffs' property.  ECF No. 49-2 at 32-33.  According to the Plaintiffs, they were given permission, among other things, to change their front door, decorate the foundations of their house and garage with "river stones", and pave their driveway and patio with paving bricks.  ECF No. 1 at ¶ 26.

Also in 2015, the Plaintiffs asked Fowlkes and Gitterman if the Plaintiffs could install a "playset" on their lot for their children.  ECF No. 49-2 at 28.  Fowlkes and Gitterman denied the request.  *Id.*  Defendant Kozo had a trampoline on his property for his children.  *Id.*  The Plaintiffs asked why Kozo "can have a trampoline for his kids and we cannot, and they said you just cannot, and we agreed, we didn't argue really . . . ."  *Id.*

The Plaintiffs planted many trees, bushes, and flowers on their lot and at the entrance of the Myfield Lane community.  ECF No. 1 at ¶ 28.

Lindemanns

Louis and Kimberly Lindemann visited the Plaintiffs many times and had dinner with them. ECF No. 49-2 at 39; ECF No. 49-3 at 30.  During dinner one evening[9], Kalashnikov commented that he was "happy to be here among people like us" to which Kimberly Lindemann responded "we are people like you?"  ECF No. 49-3 at 31.  Kalashnikov testified that Kimberly Lindemann

> showed me on her phone the video of a Russian person in a Russian hat with the red star dancing, you know, with Russian song and she said those are Russians, we are not. It was computer graphics. It was not in person. It was in graphics, a person dancing a Russian dance, military dance. This video was discriminatory in itself, showing that Russians are stupid people wearing those stupid hats, dancing like crazy.

*Id.*

On a different occasion,[10] the Lindemanns were "talking about nationalities" and remarked that the Plaintiffs should "take a DNA test find out . . . like your nationality . . . like how many

---

[9] The parties cite no information as to when this took place.
[10] Again, no information is provided as to when this took place.

percent of, you know, whatever nationalities you have in your blood[.]" ECF No. 49-2 at 40.

Election Issue

Ledeneva testified that in 2017, Fowlkes spoke to her about the election of the MLHOA Board and said she should vote for Jeffrey Kozo.  ECF No. 49-2 at 23-24.  According to Ledeneva, she wanted to vote for Kimberly Lindemann, but Fowlkes said he didn't think she was a good fit and told Ledeneva about an incident in which Lindemann entered another homeowner's house uninvited.  ECF No. 49-2 at 24.  Ledeneva testified that she told Kimberly Lindemann what Fowlkes had said and Lindemann denied it.  ECF No. 49-2 at 26.  According to Ledeneva, Kimberly Lindemann added that she thought Fowlkes was an "old school gentleman" who didn't think "that females have the same rights as men do."  *Id.*  Ledeneva testified that she decided to vote for Louis Lindemann and after the votes were tallied, Fowlkes seemed "kind of surprised" at the election result.  ECF No. 49-2 at 25.  Ledeneva further testified that she believed that Fowlkes "thought that if I'm a female, so he can dictate what I should do . . . for whom I should vote."  ECF No. 49-2 at 25-26.

2018

Plaintiffs' Driveway

In April 2018, Kalashnikov started removing the sand and gravel from the Plaintiffs' gravel driveway so that he could install brick pavers.  ECF No. 49-2 at 35.  It took months to remove the sand and gravel.  *Id.*  In June 2018, Gitterman and Fowlkes told the Plaintiffs that they could not install that type of driveway and to put it "back as it was before."  ECF No. 49-2 at 36.  Ledeneva complained to Kimberly Lindemann that she didn't understand "why they [were] doing this[.]" ECF No. 49-2 at 38.  According to Ledeneva, Kimberly Lindemann responded "maybe they discriminate [against] you because you're Russian."  *Id.*  On July 1, 2018, the Plaintiffs submitted

a request to the Executive Board requesting permission to install brick pavers on their driveway. ECF No. 49-14.  The Board approved the request.  *Id.*

Plaintiffs' Front Step

In July 2018, Kalashnikov began work on the front steps of the Plaintiffs' unit.  ECF No. 49-2 at 43.  According to the Plaintiffs, the front steps to their house had shifted away from the house so that there was a gap or "hole" between the steps and the front door of the house.  ECF No. 49-2 at 47, 48.  The Plaintiffs did not submit a written request to the Executive Board before starting the step project.  ECF No. 49-2 at 88-89.  Ledeneva testified that she did not think the Plaintiffs needed to do so "since this step is a part of the unit and it's not something new[.]"  ECF No. 49-2 at 89.

Kalashnikov first laid "metal fittings . . .  on the ground [because] he thought that maybe th[e] fittings w[ould] help to stop the step from moving."  ECF No. 49-2 at 100.  In August, he decided to "pour concrete around the step."  ECF No. 49-2 at 48, 101.  According to Ledeneva, the project "took some time, you know, it was not, like [a] one-day job, it took a pretty long period of time [during which] everybody saw that . . . [Kalashnikov] was doing something with the step."  ECF No. 49-2 at 101-102.  On August 18, 2018, Louis Lindemann, who was on the Board with Ledeneva, visited the Plaintiffs' home and according to Ledeneva, must have seen "the wooden boards and footings . . .  prepared for the concrete" but did not say anything about it.  ECF No. 49-2 at 102.

The Plaintiffs changed the front steps from two steps to three and widened them.  Compare ECF No. 49-12 at 2 (photo before work) with ECF No. 49-12 at 3 (photo after).  In addition, they cut away some of the siding surrounding the steps and placed river stones against the foundation and the top step.  ECF No. 49-12 at 3.

On August 30, 2018, Kimberly Lindemann sent Ledeneva a text message that "Valeriy [Kalashnikov] needs to stop putting the rocks on the front steps.  That work needs a request to the board because it is changing the appearance of the structure." ECF No. 49-18 at 2.  Ledeneva responded that she had obtained permission from Joe Gitterman in 2015 to "put river stones to our house and our garage foundation[.]" *Id.*  She commented that she did not "understand what or who forces you to be so concerned."  ECF No. 49-18 at 5.  Kimberly Lindemann responded that the Plaintiffs were required to request permission from the Board and referred to Article XII, Section 12.1 of the Declaration.  ECF No. 49-18 at 10.

A few days later, MLHOA Board members Louis Lindemann and Fowlkes sent the Plaintiffs a letter notifying them that the "work being done on your property" - "[c]hanges to front steps" and a "cement pad being installed on the back side of your unit garage" - had not been approved by the Executive Board as required.  ECF No. 49-21 at 2.  While the letter noted Ledeneva's contention that at the time she purchased her home, she had been given permission to make some changes to her unit, the letter stated that Gitterman indicated that he did not have a "written request" from the Plaintiffs "to make any permanent changes" to the unit.  *Id.*  The letter went on to explain that "[a] written request for Unit Improvements is required to be presented to the Executive Bord prior to any work that would cause permanent structural or facial changes to your Unit and/or Common Element" and cited the text of Article XII, Section 12.1 of the Declaration.  *Id.*  The letter stated that Ledeneva, as a unit owner and a MLHOA Board member, was "aware of the requirement to submit to the Executive Board a written request."  *Id.* at 3.  Lindemann and Fowlkes instructed the Plaintiffs "to immediately cease any and all work that would cause a structural change to your Unit and its property.  This would include your present work on front steps (which is in violation for adding permanent river stones to the front step fascia

without approval) and your garbage can cement pad (which is in violation for adding a permanent fixture to the common element)." *Id.* at 4.  The letter instructed the Plaintiffs to submit a written request to the Executive Board "to complete the work."  *Id.*  Finally, the letter stated that if the Plaintiffs continued work on these projects "without specific written/documented approval from the MLHOA Executive Board," the Board may impose "daily monetary fines" under Article 5.2 of MLHOA's Bylaws.  *Id.*

On September 12, 2018, the Plaintiffs filed an application for a building permit with the Town of Washington for a "post light" and the step work.  ECF No. 49-20 at 2-3.  The Town approved the application.  *Id.*

On September 23, 2018, Kimberly Lindemann sent a lengthy email to Fowlkes and the Myfield Lane unit owners.[11]  ECF No. 49-34.  She stated that Myfield Lane owners are required to seek written approval from the Executive Board before making permanent changes to a unit or common element and that "when you start cutting through your home's siding and adding river rock with masonry - that is considered a 'permanent' change. When you state that you will create a cement pad for your garba[g]e cans . . . that is considered a permanent change." ECF No. 49-34 at 4.  Kimberly Lindemann further stated that "[**t]he President of Myfield Lane HOA** [apparently referring to Ledeneva] **does not have unilateral ability to ignore HOA rules – nor make-up rules for his/her own personal gain**." ECF No. 49-34 at 3 (emphasis in original).  The text went on to say:

> When you decide to ignore the HOA rules and complete permanent projects without specific approval by the Board, you are acting of your own volition and the Board will have no choice but to respond accordingly. Please note: This may mean that work you complete, outside of Executive Board approval, may be subject to a daily fine and/or you may be requested to restore your unit back to its original build - at the Unit Owner[']s expense.

---

[11] It appears that Kimberly Lindemann's email was in response to one sent by the Plaintiffs.  ECF No. 49-34 at 2 ("I would like to address the e-mail that you have recently received from Unit #1."). That email is not part of the record.

* * *

> If you are not able to conform to the Rules of the HOA, which are very simple standards for such developments, you might want to consider placing your home on the market and moving to another property where you can make changes to your own contentment and satisfaction - without HOA restrictions.

ECF No. 49-34 at 5, 6.

Jeffrey Kozo also sent an email.  In a September 25, 2018 email to the association members but directed to the Plaintiffs, he stated in pertinent part:

> It is NOT only Mr & Mrs Lindemann who have concerns with your property. IT lS EVERY SINGLE Home owner on Myfield Lane. From the day your family started "Modifying" the exterior of your home and or Property it has raised RED flags in Myfield lane with me immediately. And I'll tell you why. From the day I moved in here as the 1st Home owner to BUY a home, I was told that there were to be NO exterior modifications of the home or property because the OVERALL look of myfield was to stay as uniform as possible. . . .
>
> [W]hen you began planting plants, trees, shrubs, flowers, bushes ALL OVER your property it raised a RED FLAG.  I thought … hey how come I am not allowed to do that but they are? I NEVER SAID ANYTHING . . . . BUT THEN to make things even more out of place you then rip up the driveway and start installing a paver driveway. THIS IS WHERE I DECIDED TO SPEAK UP. I called Joe [Gitterman] and asked how this is allowed? Because again you will have a shared driveway with the house "to be built" next to you someday and that's just going to look stupid. Unless your [sic] going to pay and paver everyone's driveway in [M]yfield [L]ane this is just totally unacceptable. . . .

* * *

> I don't care if you went to the town hall and have permission to paver your driveway, or build uneven, slanted, multi sized steps out front of your home. . . . If you have dreams of totally modifying and upgrading your EXTERIOR I don't feel myfield lane is the place you should have bought a home. . . .

ECF No. 49-11 at 1-3.

On September 25, 2018, William Jenks, a Building Inspector for the Town of Washington, emailed Louis Lindemann that "[t]o date there are no Building Code Issues" as to the Plaintiffs' front steps.  ECF No. 49-9 at 18; ECF No. 49-22 at 2.

On September 29, 2018, the Plaintiffs submitted a written request to the MLHOA Executive Board for "approval of concrete addition around pre-existing front door steps and use of decorative river stones on the step risers and on the wall below the front door." ECF No. 49-23 at 2.  In support, the Plaintiffs submitted the building permit they obtained from the Town of Washington.  ECF No. 49-23 at 8.  In their request, the Plaintiffs wrote that there is "no provision in the Myfield Declaration which specifically states that units in Myfield Lane community must look the same." ECF No. 49-23 at 3.  The Plaintiffs also noted that units 7 and 9 had stone walls and neither "asked for any permission[] from the Board." *Id.*

Ledeneva called a Board meeting, which was held on October 10, 2018 in her home.[12] ECF No. 49-9 at 23, 60.  She attempted to discuss rule violations by other homeowners, but Fowlkes and Louis Lindemann refused to discuss them.  ECF No. 49-2 at 21; ECF No. 49-9 at 23 (Lindemann testified that "You did try to discuss violation of other homes, but we were there to talk about the violation [of] your home.")  Lindemann asked the Plaintiffs to return the steps back to their original condition. ECF No. 49-15 at 5. According to Ledeneva, "they constantly interrupted me when I asked them, like, why do you request us to remove the step, why you want to, you know, deny our request for the step repair of work?" ECF No. 49-2 at 74.  The Plaintiffs responded they were going to "go to court."  ECF No. 49-2 at 60, 105; ECF No. 49-15 at 8. Ledeneva testified that Lindeman threatened to fine the Plaintiffs. ECF No. 49-2 at 60; ECF No. 49-9 at 22.  According to Ledeneva, Lindemann "never threatened other people who violated the rules and who still violate the rules, he doesn't threaten them with fines."  ECF No. 49-2 at 61.

---

[12] This meeting appears to have been recorded but the recording is not part of the record.  The record contains what appears to be an unofficial transcript.  ECF No. 49-15.  The Defendants do not raise any challenges to it.

After the meeting, Ledeneva emailed Lindemann and Fowlkes to schedule a Board meeting to discuss "violations of Myfield Declaration and Rules by homeowners in our community," ECF No. 49-24 at 2, but they did not respond.  ECF No. 1 at ¶ 46; ECF No. 49-2 at 22.

Later that evening, Louis Lindemann emailed the Myfield Lane homeowners an agenda for the October 21 MLHOA meeting, which stated in pertinent part:

- 2018-19 Operating Budget
- Clarification of Septic Responsibility for maintenance and repairs by Unit Owners,
- Discussion of Unit Owners requirement to seek Executive Board Approval for any and all changes related to a Unit Owner's desire to alter the exterior appearance or the common element of their unit.
- A clarification of the responsibility of any person who is elected to represent MLHOA as a Board member and/or as an appointed officer, and how these positions relate to the HOA as a whole.
- It has been requested, by unit owners, that a vote of no-confidence be taken to remove Ms. Ledeneva from her position as a Board Member representative of Myfield Lane HOA.

ECF No. 49-29 at 2-3.  Ledeneva testified that Lindemann didn't discuss the agenda with her before he sent it out.  ECF No. 49-2 at 22.  She maintains that Lindemann and Fowlkes did not "invite" her to their discussion of the budget.[13]  ECF No. 49-2 at 23.  She testified she "believe[s] they treat[ed] [her] this way because [she's] female."  *Id.*

Ledeneva emailed Louis Lindemann and Fowlkes, protesting that Lindemann had "violated the Declaration" by "not discussing the agenda with ALL Board members" before sending it out. ECF No. 49-29 at 4.  She also asked him to explain "what exactly I have done that I am no longer deemed fit to hold th[e] position [of President]."  *Id.*

On October 12, 2018, Ledeneva emailed the Defendants that she had filed "Federal and State Discrimination Complaints with appropriate Federal and State authorities."  ECF No. 49-28

---

[13] Ledeneva surmises that Fowlkes and Lindemann held a "meeting" without her.  ECF No. 49-2 at 23 (Ledeneva testified "[T]hey prepared [the] budget for the next year, right, so why didn't they invite me for the meeting when they discussed the budget?") It is not, however, clear that a meeting actually took place.  See ECF No. 49-9 at 26 (Louis Lindemann testified that Ledeneva never missed any Board meetings.)

at 2.

The Plaintiffs attended the HOA meeting on October 21, 2018.  ECF No. 49-2 at 105-06.

Ledeneva asked, by a show of hands, who did not like the Plaintiffs' steps.  ECF No. 1 at ¶ 100;

ECF 49-30 at 21; ECF No. 49 at 32.  All the Defendants responded that they did not like the

Plaintiffs' steps.  ECF No. 1 at ¶ 49.  In addition, the MLHOA voted to remove Ledeneva from the

Executive Board.[14] ECF No. 49-9 at 26.

After the meeting, Kozo spoke to the Plaintiffs about the situation.  ECF No. 1 at ¶ 96; ECF

No. 49-2 at 110. The Plaintiffs reiterated their confusion about why their request was denied.  ECF

No. 49-2 at 111 (Ledeneva testified "Again, we tried to make a point that we don't understand

what's going on, why you guys want us to remove the step.")  According to Ledeneva, Kozo said,

"What is more important for you, your step or your relationship with your neighbors?" *Id.*

In a letter to the Plaintiffs dated October 25, 2018, the Board, now comprised of Louis

Lindemann, Fowlkes, and Kozo, notified the Plaintiffs that their requests to "[a]dd a post light to

your unit," "[m]ake alterations to your front steps," and "[a]dd cosmetic embellishments to [the]

front door steps and front fascia of your home" were denied.  ECF No. 49-31 at 2.  The letter stated:

Reasons for denial of approval of your request are as follows:

1. On 10/10/18, the Executive Board Members held a Meeting/Hearing at your
home, at your request, to discuss alterations to your Unit. It was made clear to you
that all other Unit Owners were against the requested alterations and
embellishments.

2. On 10/21/18, a Home Owners Meeting was held, whereby all five Unit Owners
were counted present. At that meeting, four (4) out of five (5) Unit Owners agreed,
by vote confirmation, to deny your requests as outlined, above. Four (4) out of five
(5) Unit Owners agreed to uphold the Myfield Lane Public Offering Statement

---

[14] Section 2.6 of the Bylaws provides:  "Removal of Members of the Executive Board. The Unit Owners, by a two-thirds vote of all persons present and entitled to vote at any meeting of the Unit Owners at which a Quorum is present, may remove any member of the Executive Board with or without cause, other than a member appointed by the Declarant."  The Plaintiffs do not argue that the procedure used to remove Ledeneva was improper.

guidelines for seeking the Board's written review and approval for permanent alterations to Units at Myfield Lane.

3. The Myfield Lane Public Offering Statement follows the governing guidelines of the State of Connecticut Common Interest Ownership Act with regard to unit alterations. You received a copy of this guideline, along with a copy of the Myfield Lane Declaration Statement regarding unit alterations, at the Executive Board Meeting/Hearing of 10/10/18 and the HOA meeting of 10/21/18. A third copy is attached hereto.

4. The alterations that you have made to your front step, without Executive Board approval, do not meet state building code requirements and this is a safety hazard that the Myfield Lane HOA is caused to address.

Please be reminded that any and all alterations to your unit and/or common element are required to be reviewed and to receive written approval from the Executive Board prior to any work commencing on your Unit and its property.

Based on the outline above, it is our position that the front entry steps and the front facing exterior of your dwelling be returned to their original condition.

ECF No. 49-31 at 2-3. According to Ledeneva, six months later, another homeowner submitted a request to install an additional light, which was approved by the Board. ECF No. 49-33 at 4. In April 2019, the Board sought bids for additional lighting for all the homes in the Myfield Lane community. ECF No. 49-33 at 2.

CHRO

On November 13, 2018, the Plaintiffs filed a complaint with the United States Department of Housing and Urban Development alleging national origin and gender discrimination. ECF No. 1 at ¶ 2. Their complaint subsequently was transferred to the Connecticut Commission of Human Rights and Opportunities ("CHRO") *Id.* The Plaintiffs named as respondents the same parties they sue here. ECF No. 42 at 533. The Defendants' December 14, 2018 Answer to the complaint stated, in pertinent part, "that the [October 10, 2018 board] meeting ended abruptly because Complainant Kalashnikov threatened physical violence against Mr. Lindemann and Mr. Fowlkes and, therefore, the men opted to leave the premises." ECF 49-6 at 20 ¶ 26. The Defendants'

"Position Statement" filed in the CHRO proceeding stated the following as to the October 10, 2018

Board meeting:

> Kalashnikov further stated that if the Board did not approve his alterations to his
> unit, that he "had other ways of taking care of the issue." Lou Lindemann requested
> he elaborate on that statement. Kalashnikov stated that he had "friends in Russia
> and, in Russia, we take care of things in different ways. You will see." Given
> Kalashnikov's aggressive demeanor and thinly veiled threats, Lindemann and
> Fowlkes ended the meeting and left the property.

ECF No. 49-6 at 7.  During a fact-finding investigation in the CHRO proceeding, Louis Lindemann

told the CHRO investigator that during the October 10, 2018 Board meeting, Kalashnikov made a

statement that Lindemann construed as threatening.  ECF No. 49-7 at 11.[15]  According to

Lindemann, Kalashnikov said that he knew "billionaires in Russia and, uh, they take care of things

our own way. Don't worry. We'll take care of things our way."  ECF No. 49-7 at 11.  Lindemann

stated that "I didn't feel in threat of my life, but a threat of, you know, some kind of reprisal. So,

um, Mr. Fowlkes and I, at that time exited."  ECF No. 49-7 at 11-12.  Fowlkes also met with a

CHRO investigator.  He testified that during the meeting at the Plaintiffs' house, Kalashnikov "got

quite agitated. He was agitated when he came into the room and his voice was raised. And in fact,

he was actually waving his arms at us. And, uh, he was saying that generally speaking, that what

we were asking was unreasonable. Uh, there's no reason to do it. And lots of other things that have

been also mentioned today that these wall, other people built walls and the like, and he also did

say that, um, if we insisted on making him take it down, or he had friends in Russia, uh, who could,

who could [help] him, wealthy people."  ECF No. 49-8 at 14.  Kalashnikov denies that he

threatened anyone.  ECF No. 49-3 at 43, 46 ("They lied that I threatened them with physical

violence during this meeting that took place in our house[.]")  The CHRO "issued a dismissal and

---

[15] This testimony appears to have been recorded but the recording is not part of the record.  The record contains what
appears to be an unofficial transcript.  The Defendants do not raise any challenges to it.

finding of no reasonable cause."  ECF No. 42 at 50 ¶ 35; ECF No. 49 at 85 ¶ 35.

## II.     Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

## III.    Discussion

### A.     Housing discrimination claims under FHA and CFHA

In Counts 1 and 8, the Plaintiffs allege that the Defendants discriminated against them on the basis of national origin, gender, and familial status in violation of the FHA and CFHA.

The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).[16]

Courts evaluate FHA discrimination claims under the "*McDonnell Douglas* burden-shifting framework." *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). Under that framework, "once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 702-03 (1973)). "If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." *Id.* "Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." *Id.*

To set out a prima facie case of discrimination under the FHA, the Plaintiffs must show that: (1) they are members of a protected class; (2) the Defendants took adverse action against them; and (3) the adverse action took place under circumstances giving rise to an inference of discrimination.  *DeSouza v. Park W. Apartments, Inc.*, No. 3:15CV1668(MPS), 2018 WL 2990099, at *7 (D. Conn. June 14, 2018).  *See McCulloch v. Town of Milan*, 559 F. App'x 96, 98 (2d Cir. 2014) ("To establish a prima facie case of discrimination under the disparate treatment

---

[16] "The analogous Connecticut statute uses language that is essentially similar in some places and identical in others, *see* Conn. Gen. Stat. § 46a-64c(a)(a), and the Connecticut Supreme Court looks to federal caselaw for guidance when 'addressing claims brought under both federal and state housing laws.'" *Dempsey v. Hous. Operations Mgmt., Inc.*, No. 3:15CV615(SRU), 2016 WL 730702, at *2 (D. Conn. Feb. 23, 2016) (quoting *AvalonBay Communities, Inc. v. Town of Orange*, 256 Conn. 557, 591 (2001)).  *See Webster Bank v. Oakley*, 265 Conn. 539, 568 (2003) ("Inasmuch as the relevant provisions of the state and federal fair housing statutes in the present case are virtually identical, we apply the analysis [to the state claim] that we utilized in evaluating the defendant's [FHA] claims").  There appears to be no difference between the federal and state statutes that would be material to this case, and neither party argues otherwise.  I therefore analyze these claims together.

theory, "the plaintiff[ ] must present evidence that animus against the protected group was *a significant factor in the position taken by the [defendants]*") (internal quotation marks and citations omitted).   The Defendants do not address the first two elements.   Instead, they argue that the Plaintiffs fail to present any evidence of discrimination against any protected group.   ECF No. 42 at 24.

A party may establish an inference of discrimination by demonstrating that she has been treated "less favorably than a similarly situated [party] outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). A plaintiff may also satisfy "this element of the prima facie case by showing direct evidence of discriminatory animus, such as 'remarks made by decisionmakers that could be viewed as reflecting [such] animus.'" *Henny v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (construing Title VII[17]) (quoting *Chertkova v. Conn. Gen. Life Ins. Co*., 92 F.3d 81, 91 (2d Cir. 1996)).   Where a plaintiff presents direct evidence of discrimination, the burden-shifting analysis is inapplicable. *Maziarz v. Hous. Auth. of Town of Vernon*, No. 3:10CV2029(JCH), 2012 WL 13161208, at *5 (D. Conn. Oct. 22, 2012).

### 1.      National Origin Discrimination

The Plaintiffs allege that the Defendants denied the Plaintiffs' request concerning their step on the basis of the Plaintiffs' national origin.   As evidence, they cite Kimberly Lindemann's alleged statements that "maybe they discriminate [against] you because you're Russian," ECF No. 49-2 at 38, and "you should take a DNA test to find out what is your blood... so now you can find out ... your nationality through blood ... how many percent of ... whatever nationalities you have in your blood."   ECF No. 49-2 at 40.   The Plaintiffs also cite the exchange in which Kalashnikov stated that he was "happy to be here among people like us" to which Kimberly Lindemann responded

---

[17] "Courts, including the Second Circuit, have consistently relied on Title VII cases in their analysis of housing discrimination under the FHA." *DeSouza*, 2018 WL 2990099, at *7 n.18 (internal quotation marks omitted).

"we are people like you?" and the video she showed Kalashnikov of a person in Russian attire dancing.  ECF No. 49-3 at 31.

But Lindemann's comments do not suggest that the Defendants denied the Plaintiffs' request concerning their step based on national origin.  Kimberly Lindemann was not a Board member and not a decision maker for the MLHOA, and her comments are thus, at best, "stray remarks."  Her observation that "maybe they discriminate against you because you're Russian" is speculative on its face ("maybe"), and the Plaintiffs point to no evidence suggesting she had personal knowledge that "they" were acting in any particular manner.  And while Kalashnikov testified that he found the video distasteful, it does not demonstrate national origin discrimination, not least because it bears no connection to any of the disputed decisions by the Board.  Courts have routinely held that "stray remarks by [ ] nondecisionmakers are insufficient, without other evidence, to raise an inference of discrimination." *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 3:11CV554(VLB), 2013 WL 696424, at *7 (D. Conn. Feb. 26, 2013).  *See Danzer v. Norden Sys., Inc*., 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks alone do not support a discrimination suit.").

The Plaintiffs also argue that the Court can infer unlawful discriminatory animus because the rules governing Myfield Lane homes were selectively enforced against them and not other homeowners.  Specifically, they point to other unit members who, they say, are in violation of the rules:

- Kozo and Robidoux have stone walls on their lots. ECF No. 1 at ¶ 49.
- In 2015, Kozo was permitted to have a trampoline but Plaintiffs were not permitted to have a playset. ECF No. 1 at ¶ 51.
- Kozo operates a repair business in his garage and uses off-road vehicles. ECF No. 1 at page 15.
- Kozo has a hot tub and has parked his boat and trailer outside. *Id.*; ECF No. 49-25 at 17, 19.
- Leahey walked her dog without a leash. ECF No. 49-5 at 16.

- Robidoux has a wooden fence between her house and garage. ECF No. 1 at page 14.
- Other homeowners were not threatened with fines.  ECF No. 49-2 at 61.
- Plaintiffs' request to install additional lights was denied but in 2019, Defendants approved a request for additional lights for another homeowner, although Ledeneva was not sure which homeowner it was and further testified that the light had not been installed.  ECF No. 49-2 at 132, 134.

See ECF Nos. 49-27, 49-35 (photos).  The Plaintiffs' burden to establish a prima facie case of discrimination is "de minimis." *Cronin v. Aetna Life Ins. Co*., 46 F.3d 196, 203-04 (2d Cir. 1995). Even so, the Plaintiffs have failed to provide facts that plausibly support even a minimal inference of discriminatory motivation because the comparators they proffer are not similarly situated.  Here, the Plaintiffs made physical changes to the front of their home and distinguished their front step by adorning it with river stones.  None of the instances cited above are like that.  *See Bentley-Ammonds v. Northwell Health, Inc*., No. 21-835-cv, 2022 WL 893716, at *2 (2d Cir. Mar. 28, 2022) ("[I]n order to give rise to an inference of discrimination based on disparate treatment, the comparator must be similarly situated to the plaintiff in all material respects.") (internal quotation marks and citation omitted)).  Even if the alleged instances of noncompliance and/or alterations by other homeowners could be considered similar, there is no information as to when they occurred or the circumstances in which they occurred.[18]  The Defendants' approval of additional lights for another homeowner also does not suggest discrimination because the Plaintiffs' own exhibit indicates that in 2019 the MLHOA was considering having *all* homeowners install lights on their garages.  ECF No. 49-33 at 4.  The Plaintiffs have not put forth evidence to raise a reasonable inference of a connection between the denial of their requests as to the step and light and their national origin, whether through direct or circumstantial evidence.

---

[18] For instance, there is some evidence in the record that the stone walls on Kozo's and Robidoux's lots are retaining walls installed by the Developer/Declarant at the time Myfield Lane was constructed.  ECF No. 49-6 at 7; ECF No. 49-7 at 12, 13; ECF No. 49-6 at 20.

### a.   Defendants' Non-Discriminatory Reasons for their Actions

Even if the Plaintiffs had established a prima facie case of discrimination, the Defendants have advanced legitimate, non-discriminatory reasons for their decision.  As set forth in their October 25, 2018 letter, the MLHOA denied the Plaintiffs' request as to their steps on the grounds that the Plaintiffs failed to comply with the rule that they first seek permission from the Board before making alterations to the exterior of their unit and that the steps did not comply with the building code. ECF No. 49-31 at 2-3. Defendants' burden to produce a legitimate, non-discriminatory reason "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000) (internal quotation marks and citation omitted).  The Defendants have met this burden of production here.

### b.   Plaintiffs' Evidence of Pretext

The burden thus shifts back to the Plaintiffs to "prove that the [Defendants'] articulated reasons for their conduct was pretext for discrimination." *Birch Fam. Servs., Inc. v. Wlody*, No. 21-1553, 2022 WL 1468160, at *2 (2d Cir. May 10, 2022).  To do so, they must produce "not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by [the defendants] were false, and that more likely than not discrimination was the real reason for the [defendants'] action." *Weinstock v. Columbia Univ*., 224 F.3d 33, 42 (2d Cir. 2000) (alterations and internal quotation marks omitted).  *See Chen v. Stony Brook Univ. Advancement*, No. 20-4250, 2022 WL 289317, at *1 (2d Cir. Feb. 1, 2022) (Plaintiff must establish, not only that the reasons were false, but also that it was "more likely than not [that] discrimination was the real reason" for the adverse actions.); *Zimmermann v. Assocs. First Cap. Corp*., 251 F.3d 376, 382 (2d Cir. 2001) ("[A] record that include[s] evidence of a prima facie case and evidence permitting a finding of pretext d[oes] not suffice to permit a finding of discrimination.").  "[T]he ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod.*, *Inc.*, 530 U.S. 133, 143 (2000).

Falsity

The Plaintiffs argue that one of the two proffered reasons - that the steps were not in compliance with the building code - was false and point to William Jenks's email to Louis Lindemann – dated before the Board's October 25 letter denying the Plaintiffs' request - that there were no building code issues. ECF No. 49-22 at 2. Ledeneva testified "I believe that all other homeowners voted for removal of our step addition because they thought the step had building code violation, that's it. But in reality, it was a lie, and they knew it. It was [an] intentional lie, not just a mistake[.]" ECF No. 49-2 at 51. Considering the facts in the light most favorable to the Plaintiffs, they have introduced facts into the record upon which a reasonable jury could conclude that one of the two proffered reasons was false. This is sufficient to satisfy this first part of the pretext analysis.

Pretext for Discrimination

As to the second part of the analysis, to defeat summary judgment, a plaintiff must point to evidence sufficient to permit a rational trier of fact to conclude that discrimination was the real reason for the adverse action. But the Plaintiffs have not pointed to any evidence sufficient to permit a rational trier of fact to conclude that the Defendants' adverse actions were more likely than not motivated by unlawful discriminatory animus based on the Plaintiffs' national origin. The record is devoid of any direct evidence of discriminatory animus. Although the record contains evidence of some stray remarks by Kimberly Lindemann, these comments do not support an inference of discrimination because they were not connected to the denial of the Plaintiffs' request and there is no evidence that she was a decisionmaker. As for circumstantial evidence, as noted,

the comparators the Plaintiffs cite are not similarly situated, and Plaintiffs point to no other circumstantial evidence of national origin discrimination.

While it might be that the Defendants' denial of the Plaintiffs' request as to their step was unreasonable, that does not mean it was motivated by a discriminatory motive. Here, even when viewed in the light most favorable to the Plaintiffs, the evidence does not support a reasonable inference of discriminatory intent based on national origin.

> **2.      Gender Discrimination**

The Plaintiffs also allege gender discrimination. Specifically, Ledeneva claims that fellow Board members Fowlkes and Louis Lindemann refused to discuss rule violations by other unit owners and didn't discuss with her the budget and the agenda for the October 21, 2018 HOA meeting. ECF No. 1 at ¶ 46; ECF No. 49 at 30; ECF No. 49-2 at 21-22. As further evidence of gender discrimination, she points to Kimberly Lindemann's alleged statement that Lindemann thought Fowlkes was an "old school gentleman" who didn't think "females have the same rights as men do." ECF No 49-2 at 26. Ledeneva also cites Fowlkes's alleged statement that he wanted her to vote for Kozo. ECF No. 49-2 at 24.

Although this claim is directed at all the Defendants, the proffered evidence involves only Ledeneva's fellow Board members Fowlkes and Lindemann. As indicated, Ledeneva contends that the Defendants prevented her from performing her duties as a Board member. Although it is doubtful that such conduct would fall within the FHA, *see* 42 U.S.C. § 3604(b) (prohibiting discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of .... gender"), *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 279 (S.D.N.Y. 2019) ("to prevail on a claim of discrimination under the FHA, Plaintiff must demonstrate a relationship between the discriminatory conduct and housing"), the parties do not discuss this issue. In any event, the

evidence marshalled by the Plaintiffs, even when viewed in the light most favorable to them, fails to establish any gender animus on the part of any of the Defendants.  Kimberly Lindemann's comments about the motives or attitudes of others are speculation, as the Plaintiffs point to no evidence that she had personal knowledge of the reasons for Fowlkes's or even her husband's decisions.  And although Ledeneva subjectively construed the Defendants' actions as evidence of bias, *see* ECF No. 49-2 at 23 (Ledeneva testified that "I believe they treat me this way because I'm female."), that is not enough to support an inference of discrimination.  *See DeSouza*, 2018 WL 2990099, at *9.

   **3.     Family Status**

   The Plaintiffs also allege that they were discriminated against based on family status. Specifically, they contend they were denied permission to install a playset in their backyard while another homeowner, Kozo, was permitted to have a trampoline in his backyard for his children.[19] ECF No. 49 at 20-22.  *See* ECF No. 49-2 at 38 (When asked the basis of the familial status claim, Ledeneva testified "The only thing was that Kozo's kids were allowed to have a play set and our kid were not allowed.")

   The FHA defines familial status as "one or more individuals (who have not attained the age of 18 years) being domiciled with ... a parent or another person having legal custody." 42 U.S.C. § 3602(k). "Families with children are a protected class under the FHA, and discrimination in the terms, conditions, or privileges of sale or rental of a dwelling on account of familial status is a violation of the FHA." *Kendrick v. Greenburgh Hous. Auth.*, No. 07-CV-5859, 2011 WL 1118664, at *5 (S.D.N.Y. Mar. 22, 2011).

---

[19] The Plaintiffs assert this claim against all Defendants, but they attribute the alleged incident only to Fowlkes.  ECF No. 49 at 21.

The Plaintiffs' claim of familial status discrimination fails.  The fact that the Plaintiffs were not permitted to install a playset for their children while Kozo was allowed to have a trampoline for his children is not evidence that the Plaintiffs were discriminated against on the basis of their familial status.  Familial status discrimination entails "discrimination against families with children." *Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1088 (E.D. Cal. 2016) (quotation marks and citation omitted).  To allege a claim of disparate treatment, the Plaintiffs must allege that they were treated differently than other similarly-situated individuals because of their protected status. Because Kozo also had children, the Plaintiffs were not treated differently *because* they had children.  *See Kendrick*, 2011 WL 1118664, at *6 (for a prima facie case of familial status discrimination under § 3604(b), Plaintiff must show adverse conduct was taken against him "under circumstances that give rise to a reasonable inference that he was discriminated against on the basis of his familial status.").

### B.     Retaliation Claims

The Plaintiffs assert retaliation claims under section 3617 of the FHA (counts 2 – 5) and CFHA, Conn. Gen. Stat. § 46a-64c(a)(9) (ECF No. 1, count 8 ¶ 109).  *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002) (setting forth elements of retaliation claim under section 3617).  They allege that after they told Lindeman and Fowlkes on October 10, 2018 that they were going to "defend their rights in court" and subsequently told all the Defendants on October 12, 2018 that they had filed a discrimination complaint, the Defendants retaliated against them in various ways, including removing Ledeneva from the Board.  ECF No. 1 at ¶ 88, ECF No. 49 at 29, 38.  The Defendants, as the moving party, bear the burden of establishing that no genuine issue of material fact exists.  They failed, however, to address these claims in their initial brief and make a fleeting, conclusory reference in their reply brief to one of

the alleged instances of retaliatory conduct, asserting that it is "meritless" and state – without more - that the Plaintiffs have failed to offer any evidence of retaliation.  ECF No. 51 at 10.  But "[a]rguments may not be made for the first time in a reply brief." *Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir. 1993).  I deny summary judgment as to these claims.  *See Anderson v. Waterbury Police Dep't*, No. 14CV829 (VAB), 2017 WL 1157843, at *15 (D. Conn. Mar. 28, 2017) (denying summary judgment as to claim because defendants failed to discuss it).

### C.    FHA Quid pro quo and hostile environment harassment claims

In Count 6, the Plaintiffs allege both "quid pro quo" and "hostile environment harassment" claims on the basis of their national origin under section 3617 of the FHA and 24 C.F.R. § 100.600, a HUD regulation.

24 C.F.R. § 100.600 provides in pertinent part:

(a) General. Quid pro quo and hostile environment harassment because of race, color, religion, sex, familial status, national origin or handicap may violate sections 804, 805, 806 or 818 of the Act, depending on the conduct. The same conduct may violate one or more of these provisions.

(1) Quid pro quo harassment. Quid pro quo harassment refers to an unwelcome request or demand to engage in conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to: The sale, rental or availability of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction. An unwelcome request or demand may constitute quid pro quo harassment even if a person acquiesces in the unwelcome request or demand.

In support of their quid pro quo claim, the Plaintiffs point to Kozo's email to Kalashnikov about the Plaintiffs' driveway in which Kozo stated "Unless you['re] going to pay and paver everyone's driveway in myfield lane this [paving brick] driveway is just totally unacceptable." ECF No. 49-11 at 3.  The Plaintiffs construe this email as a demand "that Plaintiffs perform free work for the entire Myfield Lane planned development and to cover all expenses associated with the paving work of all driveways in the community," ECF No. 1 at ¶ 94, ECF No. 49 at 41, and

argue that "Defendants did not request US-born homeowners to perform free work." ECF No. 49 at 41.  No reasonable juror could find that Kozo's driveway comment was a "demand," much less that it was based on or even related to the Plaintiffs' national origin, Plaintiff Ledeneva's gender, or Plaintiffs' family status.

The Plaintiffs also allege a hostile housing environment claim.  To state a hostile housing environment claim under section 3617, a plaintiff must allege: "(1) that the plaintiff was subjected to harassment that was sufficiently pervasive and severe; (2)  the harassment occurred because of the plaintiff's membership in a protected class; and (3) the defendant is responsible for the allegedly harassing conduct." *Glover v. HPC-Eight, LLC*, No. 3:20CV1535(SALM), 2022 WL 1004572, at *10 (D. Conn. Apr. 4, 2022).  *See also A.L.M. by & Through Moore v. Bd. of Managers of Vireum Schoolhouse Condo*., No. 19-2771-CV, 2021 WL 5121137, at *1 (2d Cir. Nov. 4, 2021).  "The harassment must be 'sufficiently severe or pervasive' to alter the conditions of the housing arrangement." *Mohamed v. McLaurin*, 390 F. Supp. 3d 520, 549 (D. Vt. 2019).  "Hostile environment claims usually involve a long-lasting pattern of highly offensive behavior." *Id.* (internal quotation marks and citations omitted).

As instances of harassment, in addition to the above-mentioned evidence of other homeowners who Plaintiff allege are not in compliance with MLHOA's rules and Kozo's driveway comment, the Plaintiffs cite:

- the Defendants "falsely stat[ed]" that the step has building code violations;
- the Defendants "falsely accused" Kalashnikov "of committing a crime of threatening them with physical violence" in the CHRO proceeding;
- Lindemann and Fowlkes did not invite Ledeneva to a meeting to discuss the budget and the agenda, which interfered with her ability to perform her duties as a Board member;
- Lindemann and Fowlkes threatened to levy fines against the Plaintiffs;
- Kimberly Lindemann stated that the Plaintiffs could be fined in connection with the step repair project and "advised the Plaintiffs to put their home on the market and move to another property'";

- Kozo's statements "If you have dreams of totally modifying and upgrading your EXTERIOR I don't feel myfiled [sic] lane is the place you should have bought a home," and "what is more important for you, your step or your relationship with your neighbors?"

ECF No. 49 at 41-43.

While there can be little doubt that relations between the unit owners in Myfield Lane are antagonistic, "Congress did not intend the FHA to provide a remedy for every squabble, even continuing squabbles, between neighbors . . . ."  *Lachira v. Sutton*, No. 305CV1585(PCD), 2007 WL 1346913, at *20 (D. Conn. May 7, 2007) (internal quotation marks omitted).  Behavior that is rude or mean-spirited, but not discriminatory, does not fall within the ambit of the FHA.  Here, the evidence does not give rise to any inference that the Plaintiffs were harassed because of their national origin or any other protected status.  Nor could a reasonable factfinder conclude that the alleged conduct was sufficiently pervasive or severe.

### D.    Negligence Claims

In Count 7, the Plaintiffs assert a claim of negligence against MLHOA for "failure to train, monitor, and supervise its officers and Board Members and failure to ensure their compliance" with the FHA and CFHA.[20]  ECF No. 1 ¶ 103.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury.... Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action.... Thus, [t]here can be no actionable negligence ... unless there exists a cognizable duty of care[.]" *Doe v. Saint Francis Hosp. & Med. Ctr.*, 309 Conn. 146, 174 (2013) (internal quotation marks and alterations omitted).

---

[20] I note that with the exception of the retaliation claims, the FHA and CFHA claims are no longer in the case.

Defendants argue there are no allegations supporting a duty owed to the Plaintiffs to train or supervise the HOA's employees or agents to comply with antidiscrimination housing statutes. In response, the Plaintiffs fail to point to any authority that would establish the presence of a duty to train or supervise employees as to the FHA. Cases that have considered the issue have rejected such claims. *See, e.g. Fair Hous. Ctr. of Cent. Indiana v. Grandville Coop. Inc.,* 2017 WL 75447, at *4 (S.D. Ind. Jan. 9, 2017) (dismissing claim alleging negligence against defendants for failure to train, monitor, and supervise employees and to ensure compliance with the fair housing statutes and applicable regulations and noting absence of authority that would establish the presence of a duty to train or supervise employees under the FHA); *Fair Hous. Council of Or. v. Brookside Vill. Owners Ass'n*, 2012 WL 8017842, at *27-28 (D. Or. Oct. 19, 2012) (rejecting plaintiff's assertion that the Oregon fair housing statute, which is interpreted consistently with the FHA, "is intended to impose a common law duty on housing developments ... to train their employees in fair housing laws."); *Matarese v. Archstone Pentagon City*, 761 F. Supp. 2d 346, 365 (E.D. Va. 2011) (granting summary judgment on plaintiff's negligence claim predicated on a common law duty to train employees on FHA); *Hand v. Gilbank*, 752 N.Y.S.2d 501, 502 (N.Y. Sup. Ct. 2002) (the FHA "was not intended to create a standard of care in negligence litigation").

In Count 9, Plaintiff Kalashnikov asserts a negligence claim against MLHOA, Louis Lindeman, Kozo, and Fowlkes alleging that they "breached their duties by unreasonably denying the Plaintiffs' request for their step work on October 25, 2018." ECF No. 1 ¶ 114. In support, the Plaintiff protests that "Defendants have not established any legitimate reason for denial of Plaintiffs' request for step repair work," ECF No. 49 at 49, and points to *Grovenburg v. Rustle Meadow Assocs., LLC*, 174 Conn. App. 18 (2017) in support of his argument that a "homeowners' association must act reasonably, exercising its powers in a fair and nondiscriminatory manner."

29

ECF No. 49 at 48.  *Grovenburg,* however, is inapposite because it did not involve a negligence claim but instead a cause of action under the Common Interest Ownership Act,  Conn. Gen. Stat. § 47-278(a), in which the plaintiff alleged that the defendants "failed to approve [the fence proposal] even though all the requirements were met."  174 Conn. App. at 34.  That is not the claim set forth in Counts 7 or 9 in this case.  Because the Plaintiffs have not set forth facts suggesting the existence of a duty to act reasonably in considering the Plaintiffs' request for the step repair work, I grant the Defendants summary judgment on the negligence claims.

### E.    Negligent and Intentional Infliction of Emotional Distress

In Counts 10 and 11, the Plaintiffs assert claims of negligent and intentional infliction of emotional distress against Louis Lindemann, Kozo, and Fowlkes based on their alleged conduct of "falsely accus[ing] Plaintiff Kalashnikov of committing a crime of threatening them with physical violence," ECF No. 1 ¶¶ 117, 122, and/or unreasonably denying Plaintiffs' request to repair and decorate their step with river stones. *Id*. ¶¶ 118, 123.

To show negligent infliction of emotion distress under Connecticut law, the Plaintiffs must prove "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). "The foreseeability requirement in a negligent infliction of emotional distress claim is more specific than the standard negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm." *Stancuna v. Schaffer*, 122 Conn. App. 484, 490 (2010). "In order to state a claim for negligent infliction of emotional distress, the plaintiff must plead that the actor should have

foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm." *Id.*

The Defendants are entitled to summary judgment on the Plaintiffs' negligent infliction of emotional distress claim because no evidence in the record would support a finding that the Defendants should have realized that any of the alleged conduct posed an unreasonable risk of causing emotional distress of the type that would cause illness or bodily harm.

An intentional infliction of emotional distress claim has four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Carrol*, 262 Conn. at 443 (internal quotation marks and citations omitted). "As for the second element, whether conduct is extreme and outrageous is a question for the court, and becomes a question for the jury only if reasonable minds could differ." *Nielsen v. Van Leuven*, No. 3:15CV1154(MPS), 2017 WL 3401257, at *7 (D. Conn. Aug. 8, 2017). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Carrol*, 262 Conn. at 443 (internal quotation marks and citations omitted). Such is the case when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" *Id.* (internal quotation marks and citations omitted). Conduct, however, "that is merely insulting or displays bad manners or results in hurt feelings is insufficient." *Id.*; *see also Turner v. Connecticut Lottery Corp.*, 2021 WL 4133757, at *14 (D. Conn. Sept. 10, 2021) ("There is a high threshold for extreme and outrageous conduct in Connecticut law.").

In the recent case of *Burton v. Mason*, 2022 WL 17453123, at *1 (Conn. Super. Ct. Nov. 29, 2022), the plaintiff alleged that: (1) the defendants screamed expletives at her and her guests; (2) kicked the plaintiff's goats; (3) dumped paint onto the stone wall separating their properties; (4) threatened to have the plaintiff arrested; and (5) made threatening remarks regarding the plaintiff's goats, with one of the defendants sending a text message that the plaintiff would "pay with [the goats'] lives" and another informing the plaintiff that he would take pleasure in having the goats slaughtered for human consumption. *Id.* at *4. The Court determined, after surveying the caselaw, that the alleged conduct fell short of "extreme and outrageous." *Id.*; *see also, e.g.,* *Morrissey* v. *Yale University*, 268 Conn. 426, 428 (2004) (defendant's making disparaging remarks about plaintiff and saying that he would "kick [the plaintiff's] ass" held not to be extreme and outrageous); *Cassotto* v. *Aeschliman*, 130 Conn. App. 230, 235 (2011) (defendant's placing plaintiff at risk of violating work rules, falsely reporting that plaintiff engaged in outbursts and irrational behavior, becoming violently angry at plaintiff, and looking directly at plaintiff and stating "bang bang" held not to be extreme and outrageous). Mindful of these and similar authorities, I find that the alleged conduct the Plaintiff identifies as the basis for this claim does not meet the exacting extreme and outrageous standard.

## F. Defamation and Defamation Per Se

In Counts 13 and 14, Kalashnikov alleges defamation and defamation per se against Louis Lindemann, Kozo, and Fowlkes on the grounds that they defamed him by falsely testifying in the CHRO proceeding that he "commit[ted] a crime of threatening them with physical violence." ECF No. 1 ¶¶ 127, 131. The Plaintiff further alleges that three defendants "communicated" the false statements to "Defendants, Defendants' attorney, and investigator of the Plaintiff's fair housing

claim."   *Id.* ¶¶ 128, 132.   The Plaintiff identifies the following as the alleged defamatory statements, ECF No. 49 at 53, 57-58:

- The December 14, 2018 Respondents' Position Statement in the CHRO proceeding which states as to the October 10, 2018 meeting:

Kalashnikov further stated that if the Board did not approve his alterations to his unit, that he "had other ways of taking care of the issue." Lou Lindemann requested he elaborate on that statement. Kalashnikov stated that he had "friends in Russia and, in Russia, we take care of things in different ways. You will see." Given Kalashnikov's aggressive demeanor and thinly veiled threats, Lindemann and Fowlkes ended the meeting and left the property. ECF No. 49-6 at 7.

- Louis Lindemann's statement to the CHRO investigator that at the October 10, 2018 meeting that:

Kalashnikov said he knew "billionaires in Russia and, uh, they take care of things our own way. Don't worry. We'll take care of things our way." ECF No. 49-7 at 11. Lindemann further testified that he took the statement as a "threat."  *Id.*

- Fowlkes's statement to the CHRO investigator that at the October 10, 2018 meeting:

Kalashnikov stated that "if we insisted on making him take [the step] down, or he had friends in Russia, uh, who could, who could [help] him, wealthy people."  ECF No. 49-8 at 14. Fowlkes told the investigator that he took this comment as a veiled threat.  *Id.*

As a preliminary matter, none of these statements are attributable to Kozo.  Although the complaint alleges that Kozo testified falsely during the CHRO investigation by accusing Kalashnikov of a committing a crime of threatening physical violence,[21] ECF No. 1 at ¶ 127, Kozo denies this and testified in his deposition that he did not "say[]anything about physical violence." ECF No. 48-25 at 29.  Unlike Lindemann and Fowlkes, the record does not include the transcript of his testimony in the CHRO proceeding.  And therefore the record does not include, as it must, the specific statement(s) the Plaintiff attributes to him.  *See Stevens v. Helming*, 163 Conn. App. 241, 247 n.3 ("complaint for defamation must, on its face, specifically identify what allegedly

---

[21] Kozo did not attend the October 10 board meeting, which was where the contested remarks occurred.

defamatory statements were made, by whom, and to whom.") As a result, I grant summary judgment as to Kozo on these counts.

To state a claim for defamation under Connecticut law, a plaintiff must plead facts demonstrating that "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217 (2004). "[O]pinion cannot be the basis for a defamation claim." *Moses v. St. Vincent's Special Needs Ctr., Inc.*, No. 3:17-CV-1936 (SRU), 2021 WL 1123851, at *12 (D. Conn. Mar. 24, 2021).

A claim of defamation *per se* requires a plaintiff to allege a statement whose "defamatory meaning ... is apparent on the face of [it]," and accordingly the statement "is actionable without proof of actual damages." *Battista v. United Illuminating Co.*, 10 Conn. App. 486, 491-92 (1987) (citation omitted). "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation." *Id* at 492 (citation and internal quotation marks omitted). Whether a statement constitutes defamation *per se* "is a question for the court." *Id.* (citation and internal quotation marks omitted). "Connecticut has generally recognized two categories of statements which are actionable as defamatory *per se*: (1) statements charging a plaintiff of a crime, and (2) statements that injure a plaintiff in their profession." *Wynn v. New Haven Bd. of Educ.,* No. 3:21CV925(SVN), 2022 WL 1063732, at *4 (D. Conn. Apr. 8, 2022) (citations omitted). Here, the Plaintiffs allege that Louis Lindemann and Fowlkes falsely stated that Kalashnikov threatened them and that threatening is a crime under Conn Gen. Stat. § 53a-62. ECF No. 49 at 54. As a result, the Plaintiffs argue, Lindemann and Fowlkes are liable for defamation per se. *Id.* at 55.

The Defendants argue that the Plaintiffs' defamation claims fail because even if defamatory statements were made, they are privileged because they were made during the CHRO proceedings and investigations, which are quasi-judicial in nature.  I agree.

> Statements made during judicial proceedings are entitled to immunity from liability for defamation. Connecticut follows the common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy…. That privilege extends to statements made in quasi-judicial proceedings that have powers of discretion in applying the law to the facts which are regarded as judicial or quasi-judicial, in character.… The CHRO has been recognized as a quasi-judicial body given its discretion to decide facts and apply law, and courts have held that statements made during CHRO proceedings and investigations are therefore absolutely privileged.

*Moses v. St. Vincent's Special Needs Ctr., Inc.*, No. 3:17CV1936(SRU), 2021 WL 1123851, at *12 (D. Conn. Mar. 24, 2021) (internal quotation marks and citation omitted).  *See also Goodwin v. Milot,* 2022 WL 1538703, at *4 (Conn. Super. Ct. May 16, 2022) (statements made during quasi-judicial proceedings are "absolutely privileged from liability when they are pertinent and material to the controversy, even if such statements are made while the communicator knows of their falsity")*; Raye v. Wesleyan Univ.*, 2003 WL 1962881, at *3 (Conn. Super. Ct. Apr. 10, 2003) ("Statements that fall under the protection of absolute privilege are completely immune from any defamation liability even if the statements are false and malicious.")  Because the statements attributable to Lindemann and Fowlkes are privileged, I grant them summary judgment on the defamation claims.

### G.    Perjury, Harassment, and Extortion

In Count 15, the Plaintiff alleges "perjury under federal and state law" as to Lindemann, Kozo, and Fowlkes on the grounds that they testified falsely in the CHRO proceeding.  ECF No. 1 at ¶ 135.  In Count 16, the Plaintiffs allege a claim of harassment as to all Defendants on the basis of "unreasonably denying Plaintiffs' request for step repair work," "falsely accusing Plaintiff

Kalashnikov of committing a crime of threatening Defendants with physical violence," "demanding that Plaintiffs perform free work for Defendants," and "discriminating and retaliating Plaintiffs[.]" ECF No. 1 ¶ 139. In Count 17, the Plaintiffs allege a claim of extortion on the grounds that the Defendants tried to compel the Plaintiffs to install driveways for them. ECF No. 1 ¶ 142.

Perjury is a criminal offense involving the willful act of swearing a false oath or of falsifying an affirmation to tell the truth. *See* 18 U.S.C. § 1621; Conn. Gen. Stat. § 53a-156. There are also criminal statutes governing harassment and extortion. *See* Conn. Gen. Stat. § 53a-183. But none of these statutes create private causes of action. *See Ngo v. Wirtes*, 2019 WL 4322666, at *4 (Conn. Super. Ct. Aug. 20, 2019) ("[P]erjury is not a private cause of action and cannot be brought in civil court."); *Holt v. Safeco Ins. Co. of Am*., 2016 WL 4744129, at *7 (Conn. Super. Ct. Aug. 8, 2016) ("The court can find no case ... in which any Connecticut court has recognized harassment as a civil cause of action."): *Lenzo v. Gallant*, 2022 WL 6419098, at *5 (Conn. Super. Ct. Sept. 21, 2022) ("[T]here is no recognizable civil cause of action for extortion in Connecticut.") (citing cases). These claims fail as a matter of law.

## IV.    Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment is GRANTED as to counts 1, 6-7, and 9-17 and is DENIED as to the FHA and CFHA retaliation claims in counts 2-5 and 8.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: February 9, 2023
        Hartford, Connecticut